Okay, thank you. Good morning, Judge Wayne, Judge Bennett, Judge Harpool. May it please the court, my name is Whitney Sellert of the Gargolden Law Firm. I'm representing Shad Cottelli in his appeal of the district court's decision denying his motion to set aside a $2 million judgment entered against him by default without opportunity to appear to defend himself. I'd like to reserve three minutes for rebuttal if I may. All right. First, let me say that casting aspersions about any party opponent is not something I do lightly. In my brief, I use the word conflation on purpose because I think any objective review of the record required no less. It's a difficult thing, I think the court can appreciate, to be targeted by the government and to find oneself faced with the daunting task of defending yourself against an entity with relatively unlimited manpower and resources. And that was the case for co-defendant Infante, who was effectively let go for $15,000 in a cooperation agreement. My client never had the opportunity to appear and defend himself at all. Consequently, in addition to a $2 million judgment, when you Google his name and that of his co-defendant Infante, they're directly linked to this lawsuit, this judgment, and a revenge porn operation they simply had no part in. I start from the premise that the regulatory and investigative powers of a federally funded agency like the FTC are not something that should be casually misused or abused to engineer results that are not supported by the facts. There's an old saying, when you think you're a hammer, everything starts to look like a nail. And I think regulatory authorities can fall prey to that kind of thinking, often to a fault, and I believe that's what's happened here. Obviously, from the record, the FTC spent a great deal of time, energy, and effort over two and a by a company called Yeecox Limited. Not by, I don't know if that's the correct pronunciation or not, but not by my client, Neil Infante, or the company they used to own. Although that's not what Mr. Infante testifies, right? Mr. Infante testified that he and my client owned a company called EMP, which is a named defendant in this company and had nothing to do with this revenge porn website at any point in time. My client, because they owned this domain name that later became the host site for a revenge porn website, I think that's how they came to be focused on as nails, I think, by the FTC that ended up being hammered. But what I think is most bizarre from this record is the FTC's utter failure to prosecute the one nail that it clearly knew and understood was operating this website, Yeecox Limited. The discrete issue before the court, however, is whether the default judgment engineered by the FTC against my client should have been set aside as void and for good cause. The merits defense articulated by my client, namely that he was uninvolved in this revenge porn operation, is one of the factors relevant to that determination. But the merits of that defense are yet to be tried. And that's the point. Justice greatly prefers judgment on the merits to judgment by default. And the reason is clear, because default judgments can often lead to unjust results. And justice, after all, is the point of the exercise. So I question the propriety of granting leave to serve a defendant by email only two weeks after the complaint was filed, where the plaintiff made no prior effort to attempt physical service at the active personal and business addresses it had just documented for my client in South Africa. The FTC knew where he lived, they knew where he worked, but the record's utterly devoid of any effort to serve the pre-litigation CID. I'm sorry, the FTC knew where he lived and where was that? In South Africa? Didn't they undertake efforts to try to locate him, at least according to their reports in South Africa, including going to where he lived, talking to concierges or doorman, other people? And isn't that in the record? Didn't the district court rely on that? It absolutely is in the record. But when you look at it and examine it carefully, that evidence doesn't, all it shows is that they went and looked for him there, not that they left word for him anywhere. They knew his address, they identified his personal residence, they identified his businesses that he worked with and folks that he worked with, but there's no evidence when you look at the declarations of any of those investigators that they actually left a copy of the CID or even explain what the purpose of their inquiry was. But Mr. Infante specifically testified that he told your client, and this is at page 29 and 30 of his deposition, about the CID that he had received and the fact that he was in fact going for an interrogation under oath, right? Absolutely correct, your honor. The fact that or even Mr. Infante telling my client that he was the subject of that investigation. And if you read through, and I think I cited it in my brief as well, his deposition, Mr. Infante says that when he told my client that, my client told him, well great, cooperate fully, tell him the truth, we've got nothing to hide, there's nothing to worry about. And that's when you read Mr. Infante's deposition testimony, that's what he did. He said, yes, we had this company, this company owned domain names, I'm unaware of any revenge porn website or anything of that nature. So in allowing service under rule four, your argument is that the district court abused its discretion? That's correct, because- Go ahead. That's a pretty high burden, counsel, especially given, for example, what the government claimed was your client's October 20, 2017 email talking about what the FTC was doing and how nobody could be liable for it because the law didn't support it. I understand that that would appear to be a high burden, but the invocation of rule four F as an alternative means of service requires some demonstration by the FTC that it was necessary. And how do you even cross that threshold when you know a defendant's physical address and you have not even attempted physical service? Now, assuming they could even skip that step and go directly to rule four F as if email would be available to them as a means of service without demonstrating necessity of the court to create this alternative service option for them, you have to look at the actual emails that the FTC proffered. And when you do that and you look in their moving papers and examine it carefully, they greatly exaggerated their recency and frequency with which those emails were used by my client at all. By the time the FTC filed that motion, they knew three of those emails had not been used in any active sense for more than a year. Okay, but even if that's true, counsel, the declaration of Mr. Infante is talking about October 20, 2017, enzovalentino at protomail.com, which he says is Mr. Applegate's email that he communicated with him on. And the FTC said when they sent to that email address, nothing ever bounced back. That's right. And my problem with that is in the context of a motion to set aside, which first of all, possible. And so that's its guiding principle to begin with. And when you undertake that consideration in the context of just being told that there were four email accounts that were being frequently and regularly used by the defendant, and that's clearly not true. And then that leaves you holding and looking at this one single email that's attributed to my client, frankly, through a declaration that was written by the FTC for Mr. Infante pursuant to his cooperation clause. But when you carefully look at the email itself, there's nothing in the email even indicates that the FTC is planning to sue my client or is... Correct. Although I disagree with you with regard to the content of the email. It's recent. It sure looks like it's an email that would be from your client and nothing ever bounced back. So how did the district court abuse its discretion in deciding that your client had noticed because it was served via that email? I mean, even if a reasonable jurist could have come to a different conclusion, how did this district court abuse its discretion? Well, I think, your honor, it abused its discretion because in the context of the standards that apply to a motion to set aside, the main guiding principle is to favor trial on the merits wherever possible. And so in this case, when you look at one email, it's very difficult, I think, to give it the kind of credence that would override that guiding principles and preference for trial on the merits. And the reasons are... I'm confused. Did your client get the email or not? Has he taken the position? He's claiming he never got it. Does he have an explanation why it didn't bounce back? Or why other people are using that email? No, see, my client, when he appeared, he said, I don't know whose account that is. It's not my account. I don't use it. There's nothing in the record linking it to him other than this one line attribution and the declaration of Neil Infante. The email itself is obviously part of a longer email string, yet no part of that string is attached to this email. There's nothing in the email that indicates it's written by my client. My client's not mentioned in the email at all. My client says, I don't know who the heck Enzo Van Valentino at ProtonMail is, but it's not me. So the fact that it's an active email account and that it didn't bounce back is rather unremarkable when considered in the context of him saying it's not my email account. Other than there's other people who say it is his email account. At least it is Mr. Infante. Correct, Your Honor. And my problem with that relying on that is it's obvious that Mr. Infante's declaration was written for him. It directly contradicts his prior testimony during the CID where he said, I mean, Mr. Infante said, I have not seen Chad Catelli since 2013. I have one email for him that I know of. It's this Gmail account, right? The FTC doesn't even bother to try to use that account for more than six months. By the time it's invoking this Enzo Valentino email account, many months later, there's zero foundation laid for how in the world Mr. Infante would attribute that to Mr. Catelli when the email itself makes no such reference. Except by its content. It sure looks like it would come from somebody who was the owner and had knowledge and wanted this CID and upcoming lawsuit to go away. So it's not like it's some random email that somebody's attributing to your client. It's an It either would or certainly could have actually been written by your client. Well, it could or certainly could have been written by anyone that Mr. Infante was discussing the merits of this claim against him as well. And the world within which that conversation would take place is not limited to my client. And I would submit that there's nothing about the email itself that indicates it was to or from him. You can't even see the beginning and end of the thread. There's no other emails from that account that were ever offered to corroborate that supposition. The only thing attributing it to my client is one line of a declaration from a co-defendant who's obligated under cooperation clause to work with the FTC and where that one line attribution directly contradicts his sworn testimony seven months earlier. Do you want to save the rest of your time, counsel? Yes, your honor. Thank you. Thank you, your honors, and may it please the court. Mary L. Getz for the Federal Trade Commission. There are two key questions here. And the first one is, was the email service reasonably calculated to reach Mr. Catelli? And the second one is, did the district court act within its discretion when it denied him relief from the default judgment nearly two years after it had been entered? The answer to both questions is clearly yes. With respect to the email service, whether and when to authorize service by email is a question this court has said is committed to the sound discretion of the district court based on the specific circumstances of the case. And as some of your honors questions indicated here, these circumstances included that Mr. Catelli was experienced online business person who heavily relied on email, did not maintain a physical office location, that he had a history of going to great lengths to avoid being subject to law enforcement scrutiny, including changing his name and fleeing to other countries, that he had made himself impossible to physically locate despite the FTC's best efforts over the course of a yearlong international search, and that he had used four specific email addresses to communicate, including about this very matter, and that's the Proton email that we've just been discussing. But we were talking about the Proton email, but the entire attribution to Mr. Catelli, it's paragraph 17 of the declaration, right? Paragraph 17 of Mr. Infante's declaration, yes, at ER 194. And it says he emailed me from email address. I mean, if this were somebody testifying to that on the witness stand, and the objection were lack of foundation, and this was all that that there was, the objection would be sustained. So why is this enough to establish his personal knowledge? I mean, he has boilerplate at the beginning, like everybody does in a declaration, I make these things on personal knowledge, but typically there would be some explanation as to what that personal knowledge was based on, and there's nothing in this declaration, unless I'm missing it, that establishes it vis-a-vis this particular email address. Yes, your honor, and I think the critical thing is to situate this email in the factual context. So what the record showed was that in September of 2017, FTC staff tried to inform Mr. Catelli that the FTC was planning to sue him, and they used his two long-standing email addresses that Mr. Catelli had a basis for his conclusory statement that Applegate emailed me from this address. Why isn't it in the declaration? Like I communicated with him for six months at this email address. We had sent back and forth 15 or 20 emails. The reason I know this is from him is because I know that sometimes his alias was Enzo Valentino, but there's nothing like that in here. So why should we decide that this is sufficient to establish what I think is a crucial email here? Yes, your honor, and first of all, I think, of course, in an ideal world, it would be great to have those facts in the record, but it's not required to exhaustively authenticate each piece of evidence that a witness is putting forward in a declaration like this. And the point is that Mr. Catelli had the chance to make these arguments to the district court when it sought to set aside the judgment, made all the arguments that Mr. Seller just outlined, and the court didn't buy it. And that was entirely within the district court's discretion, given the context here. And as I was starting to say before, the context here is that Mr. Catelli closed his longstanding Gmail account after the FTC reached out to tell him that they were planning to sue. That is extremely incriminating. That happened between September 2017 and the filing of the complaint in January 2018. And so I think it's entirely reasonable for a district court looking at that material, looking at the past conduct of Mr. Catelli, of fleeing law enforcement, of being on notice that questions were being asked about his websites, to say this is clearly someone who is trying to evade service. He, you know, later we find out that the emails bounced back from those longstanding emails because he had deleted them. And I think it was entirely appropriate for the court to say, you know what, in these circumstances, everything we know about this defendant, it's not unusual to think that he's using secret other email accounts to communicate in order to avoid having authorities track him down. So I don't think there is any anything improper about the district court saying that this Proton email account, making it a factual finding, which is what it did. It made a factual finding, subject only to clear error review in this court, that Mr. Catelli sent that email and that he was the author of that email. But I think more importantly, one of the bigger factual issues here is that Mr. Catelli doesn't dispute that he knew about the FTC's investigation. He doesn't deny receiving those September 2017 emails from the FTC. He does not deny it. He was on full notice that the FTC was specifically about to sue him personally. That's what the September 2017 email said. So this just is not the case where all of this depends on this one email. There is an extensive factual background here, all of which points to Mr. Catelli being an unreliable person who was trying to evade law enforcement. Counsel, with regard to the merits of the motion to set aside the default judgment, I know the district court said in its order denying that the FTC would be prejudiced because the evidence that it would need is destroyed. Can you clarify that it wasn't clear to me, looking at the government's opposition below, really what the government had if default judgment were to be set aside? Yes, Your Honor. You mean what was the basis for the argument about prejudice? What evidence was destroyed? Oh, yes. After default judgment, the government shredded all the evidence it had? Not all the evidence it had, Your Honor, but this was a case involving extremely offensive, highly personal content on these websites. So non-consensual pornography, naked pictures of people posted without their consent. So there were screenshots of the website, for example, showing this content. By the time the motion to set aside the default judgment was filed, the FTC no longer had access to that evidence. Exactly, Your Honor. Sensitive evidence. I'm sorry? The sensitive evidence. Is that correct? Exactly. Exactly. And I think the court looked at that and relied on that, but it also said there's other reasons to think that there's prejudice here. First of all, we're dealing with an elusive international globe-trotting defendant and conducting discovery in this situation, given what we know about him, would be more difficult now. So there was ample grounds for the court relying on the prejudice prong here. And I think that's really one thing that sets aside, that distinguishes this case from the several cases that Mr. Catelli cites in his brief, where the court did reverse a district court denial of was that, number one, there was no prejudice. There was no either prejudice, the lack of prejudice was conceded or the court said, there's no prejudice here beyond simple delay, which is not prejudice. But also in those cases, there was no, not a shred of evidence, not a glimmer of suggestion of bad faith on the part of the movement. And here, everywhere you look, there is evidence of bad faith. There was evidence that Mr. Catelli was trying to avoid being held responsible in court, having his assets taken. In the other cases where the court has held that the standards, that relief should have been granted, there was no suggestion that the defendant, for example, being abroad was not the result of a genuine reason for them to be abroad, like medical treatment, but in fact, they were trying to evade the clutches of the court. So those two things, I think, distinguish those cases from this case. And what the cases say is that these factors, the three factors are disjunctive. So the court only needs to find one of them is met in order to justify denying a Rule 60, a Rule 60B motion. And then in addition to that, there's the independent requirement under Rule 60C1 that the motion is brought within a that the district court relied on, that supports the denial of relief, even setting aside the other three factors. Here, Mr. Catelli claimed he didn't learn of the default judgment until September 2019. But the court said, looking at all of the evidence and looking at the timeline here, Mr. Catelli knew full well about this investigation even before the lawsuit was filed. So this was not a case where the defendant was taken completely by surprise by these legal proceedings and somehow could justify, in this case, even beyond the period in which he claims he learned of the judgment, he waited an additional six months. And what the cases say is that whether something is brought within a reasonable time is a very fact-dependent question, and it's going to vary from case to case and depends on all the circumstances. And here, the district court very properly concluded that given Mr. Catelli's prior knowledge of not just the investigation but also the impending lawsuit, that that additional delay was not reasonable. So there's several independent grounds supporting the denial of relief here. And I would also just add that, of course, the additional factor of culpable conduct clearly weighs in the FTC's favor here and is an independent ground to affirm the judgment, even though the district court didn't expressly rely on that below. I did want to make sure I got a chance to address a couple of the things that Mr. Seller said during his argument. And the first one is, he said his client didn't have the opportunity to defend that the FTC sent to him that did not result in a bounce back and that Mr. Catelli concedes he received. He certainly doesn't dispute that he received those. Those said, we're planning to sue you. Let us know if you want to see a copy of the complaint. We will send it to you. And what did Mr. Catelli do in response to that information? Well, he later went on and apparently closed those email accounts. He did not come forward to the FTC and say, hey, you know what, like, you've got the wrong guy here. This is actually another entity that's responsible for the content of this site. He didn't do any of that. He deleted his Gmail accounts to try to avoid the FTC having further communications with him. So it cannot be the case that a defendant can sort of bury his head in the sand, cover his eyes and ears and refuse to find out if he has been sued. That just does not square with the record here. The other thing I want to be sure to address is the suggestion that the FTC in any way misused or abused its authority with the district court. FTC staff attorneys were 100% candid with the court every step of the way here in the motion for alternative service. We had witnesses describe all of the steps that had been taken to try to going in person to all of his addresses of record in the United States, nowhere finding him. The address that he had used extensively with GoDaddy relating to the Internet businesses he ran, that turned out to just be a mail receiving facility. And that's where the FTC sent the CID directed to Mr. Catelli. The receptionist signed for that CID. And again, Mr. Catelli does not that CID. So it's not the case that he had no reason to think that the FTC might be looking into him personally and that all he knew was that Mr. Infante, who clearly played a much lesser role in this overall scheme, that he was the only one the FTC was concerned with. A couple more things just in my last minute remaining here. Again, the suggestion that the FTC knew that three of these email accounts had not been used, that is absolutely not true. At the time the FTC sought alternative service and as it outlined in its filings with the court, it was under the impression that the Gmail accounts were valid. And again, it's because that September 2017 email correspondence did not result in any bounce backs. So it's not the case that the FTC knew anything of the sort. The FTC thought that those emails were still working. They also thought that these additional two emails Mr. Infante had identified were clearly being used by Mr. Catelli. So to err on the side of caution, it asked to serve all four of the email addresses and that's indeed what it did. And there was nothing, you know, anything less than above about the FTC's dealings with the district court here. And with that, I see my time is expiring. So I would just ask that the district court affirm the district court's denial of relief from this judgment. Thank you. Thank you. You've got a little bit of rebuttal time. You're on mute. Can you hear me now? Yes, thank you. Okay, I'll try to do my best with it. To the FTC's last point, the notion that it was above board with the district court, it's just, it's simply unsupported by the record. When you look at their motion for alternative service, they flatly suggested repeatedly and wrongly that those four email accounts were being regularly used by Mr.  Catelli. Not one of those accounts was used as recently as November 2017. Three of them hadn't been actively used in a year. And one of them, only one of them had been used in October 2017. And that's the one we just talked about where your honor correctly observed, there's basically zero foundation for the admissibility or reliability of that one email being attributed to him. The notion that he received and was aware of this lawsuit and that's not disputed is wrong. He flatly contested that in his affidavit in support of his motion to set aside the judgment. The notion also that he was fleeing law enforcement at some point, there's no evidence in the record of that. And that's really the problem with most of the FTC's assertions. The deeper you dig into the foundation of those kinds of assertions, the more you find that they're simply conflating and jumbling the chronology and the facts to create the appearance that Mr. Catelli was involved in this revenge porn website when in fact they knew, they knew darn well it was Yeecox. And for whatever reason, they chose not to serve that client or that defendant or prosecute that defendant. And the notion that my client was trying to avoid seizure of his assets is simply unfounded. He showed up and has showed up as soon as he found out about that judgment to set it aside. But I would point out that the FTC had a judgment for more than a year. And despite representing to the district court that it knew of Mr. Catelli's accounts associated with this business and other businesses, made no effort to execute on it. All right. Thank you, counsel. Thank you. And thank the government as well for your argument today. The matter is submitted. That concludes our argument calendar for today. So we're in recess until tomorrow morning. This court for this session stands adjourned.
judges: Nguyen, Harpool, Bennett